Good morning, Your Honors. My name is Patrick Robbins. I represent the defendant below and appellant here, Ethan Berry, and I was trial counsel below as well. And with the Court's permission, I'd like to reserve three minutes for rebuttal. All right. We identified three trial errors below, which were cumulative and related in the sense that they fundamentally compromised the element of intent. These errors allowed the government to circumvent some important safeguards and hurdles that both Congress in the statute and in the Federal Rules of Evidence and through the Confrontation Clause put in place before a person like Mr. Berry and his situation can be labeled a felon and imprisoned. The first error, and perhaps the most obvious one, was the instruction that the Court gave on the element of willfulness. And we submit the Court's review here is de novo because it relates to an element of the offense. The Court watered down Congress's prescription for intent here. Willfully is one of the highest, as the Court knows, among criminal statutes. Put most simply, the Court gave an instruction that was the opposite of willfully. Now, the government spends a lot of its time in its brief knocking down the argument that we shouldn't get what I call the rat's laugh standard. That is that Mr. Berry had to know he was violating a known legal duty. We did argue that below, but at a minimum, we suggested to Judge Jensen below that Mr. Berry should get the standard that he had to know what he did was unlawful. What was Judge Jensen's rationale in, like, refusing your instruction? Your Honor, when we argue Bryan, which is a Supreme Court case that involved firearms statute, it talks about how a defendant has to know what he's doing is bad and then goes on to say that means unlawful. And Judge Jensen suggested that those were confusing and meaningless terms for a jury to understand. He didn't think it made sense, and he said he wasn't going to give that instruction. Well, that's because he had already been informed about his obligations as a representative in this matter. Didn't he say that? Certainly. He – there was – the government proffered evidence to that effect. There are two problems with that evidence. One is we obviously think that the documents that came in under 803 shouldn't have come in. Are you talking about the computer-generated? Computer-generated records. The government could have brought in Mr. Fan, the person that created them. They were an adversarial interview and violated 803-8. Under that rationale. But secondly, in the cases like Awad and Henderson, we'll start with Awad. In that case, the jury had to find intent to defraud, and the court said, of course, that's harmless error. In the Henderson case, the defendant actually received notice before he trespassed, and the court said that's harmless error. Here, Social Security was supposed to have a signed receipt and a signed document. These computer records, we insist, should come out. Signed by the defendant. They had none of that. They could not find any signed document. The person who took the interview, Mr. Fan, was essentially fired for incompetence. The person the government brought in knew nothing whatsoever about the interview that was conducted with Mr. Berry. But the jury heard all of that evidence. And the issue was whether or not he was notified of his obligation as a representative payee. So regardless of the evidentiary objections to the evidence and the weight that could be placed on them, the jury heard all of that and nevertheless convicted. And the definition of willfully was based on the fact that he was given instructions regarding his duties as a payee. So why isn't any error harmless? Because, Your Honor, the jury wasn't properly instructed about what the word willfully means. The jury wasn't told Mr. Berry had to know what he was doing was unlawful. In fact, the Court instructed that the jury did not have to find that what he did was unlawful, which is directly contrary to the Awad case. In United States v. Awad, this Court said that instruction, where the word willfully appears in the statute, is the opposite of what Brian prescribes. But the Court ultimately said any error was harmless because he knew that receipt of the Medicare payments was unlawful because he was told what his obligations were. So why doesn't that same analysis apply here? Because the evidence was not clear at all. In fact, we submitted. If we disagree with you regarding whether or not the evidence was properly before the jury, do you lose? I don't think even getting the evidence in means we lose, because the jury didn't get a chance to consider whether what Mr. Berry, when he acted, he knew he was acting in violation of law. Even if the record says otherwise? I'm sorry, Your Honor? Even if the record indicates otherwise? Well, obviously, as I said, we suggest the evidence was extremely weak as to what Mr. Berry was advised about. There was no witness at trial who could testify that Mr. Berry was told anything     That's what the suggested evidence was. Well, was there any evidence introduced as to the lump sum payment now? What ultimately happened to that? In other words, as far as I can tell, it went to the certain bank accounts,  It did, Your Honor. And then what happened to it after that? Was it spent by the defendant for his own use? Is there evidence to that effect? There was no evidence that it was spent. In fact, the evidence that it went to his sister. Correct. And that it was spent. Wasn't it sitting in his sister's account? It was. I mean, I don't see any evidence that it was actually spent either by the sister or by him. Your Honor, this is a critical point because it is the oddest of theft cases where the defendant saved and did not spend the money. But was that evidence presented at trial on the defendant's behalf that the money was saved on behalf of the child? It was, Your Honor. We put in one witness, a former probation officer who served as a summary witness summarizing the bank records. At ER 531, you'll see the chart that that witness presented. And it shows that Mr. Berry deposited more of his own money into those accounts than he spent for his food. Well, but that's not the question. The question is, was the lump sum payment spent? And I ask you if there was any evidence put in specifically regarding the lump sum payment and what happened to it after it went into the sister's account. The sister could have come in and testified regarding what happened to the money. So I'm just asking you, what specific evidence was there in the record regarding that specific lump sum amount? The record evidence was at the close of the records the government put in, the money remained in the sister's account, which is the Pioneer Credit Union account. And to answer Your Honor's question, the retroactive payment went into the Wells Fargo account, and a few days later, the defendant's sister moved that money to her Pioneer Credit Union account. And did Mr. Berry have access to that account? He did not have access to that account. And did the child have access to that account? The child did not, Your Honor. And did the child's mother have access to that account? Of course not, Your Honor. She did not. And didn't your client indicate that any monies that were saved and not spent were really saved on his own behalf when he hoped to receive a positive indication from Social Security that he was? Correct, Your Honor. And I want to emphasize that the government's own witnesses testified. Ms. Barrios-Terry, with 30 years of experience in this area, testified that mislabeling an account is not misuse or conversion. There are rules that allow parents to co-mingle their funds with other funds, unique in the entire regime of Social Security benefit payments. Also that is. But there was no indication that the monies saved were for the benefit of the child. Your Honor, the Social Security regulations provide in general that money set aside has to be labeled and separate and segregated. But there are rules, different rules for parents that allow the co-mingling in a Well, even though it's co-mingled, you would expect that some of the monies would be used for the benefit of the child. And there's no evidence that that need occur. No, but use and benefit allows two approaches. One is to spend on current needs. If those needs are satisfied, the money may be conserved. But what evidence was there in the record that the child's current needs were being satisfied from the Social Security funds? I thought the mother testified to the contrary. I respectfully disagree, Your Honor. I think we established through the testimony of the mother that D.B.'s, the son's needs were fully satisfied. Not by the money from Social Security. No, Your Honor, not. But once current needs are satisfied under Social Security rules. You're not arguing, are you, that if the mother satisfied the needs of the child from her own personal funds, then that obviates any need for the father to, as the Social Security benefits on behalf of the child? Is that your argument? It is not, Your Honor. Our argument is that in that situation. And the mother indicated that she didn't even know that these funds had been provided by Social Security. That's correct. She did testify. But under the rules, a person, a representative payee in Mr. Berry's situation may conserve the funds. The government's theory was that he would save the funds. Conserve the funds for what purpose? To save them, to set them aside. For what purpose? For the benefit of the child. Right. And there's no evidence that that, indeed, was the reason for saving it. It was just the opposite, that he was saving it because he expected Social Security to find that he was disabled, and then he would do something, I don't know what. To be clear, Social Security had already determined that he was disabled, and that was the reason that his son was entitled to these benefits. Right. He may save money for the benefit of the child in the future. He was fighting for custody of his son. He had custody, physical custody, for three years of the period he received a retroactive payment where he was spending money on his son, had to rent a home, had to pay bills, et cetera. Under the rules, he was entitled as a representative payee to conserve the funds. What about after he didn't have custody? After the point he did not have custody. When he no longer had custody. There was a period when he did not have custody. Longer than he did have custody. Actually, I think that's not quite right. I think the majority of the retroactive period, he did have custody. Yeah, but I'm talking about prospective. When he got the prospective benefits, he did not have custody. Your Honor, he did have. It's a distinction under California family law. He did have legal custody throughout the period. Well, you were talking about physical custody when he was spending money on the child. But when he got the prospective payments, he did not have physical custody. There's no evidence in the record that he was spending any money on the child. That's correct. And the government's case revolved around the idea that he didn't spend money on his child, D.B., at that time. But the rules allow conservation or savings. And savings. If the needs of the child are met. How were the needs of the child met through the use of the funds if he was conserving all of the funds? To be clear, the measure of whether the needs were met or not through the use of the funds, the measure would be, assuming Mr. What was the evidence in the record that the needs of the child were met? The mother said it was a struggle for her to take care of the child. So the jury heard all of that evidence and nevertheless convicted Mr. Berry, despite the profit evidence that the needs of the child were met. They did, Your Honor, but they were not properly charged. They got computerized records that violated the rule, and the government commented on Mr. Berry's silence in a way to argue that he had intent. Three fundamental and unfair errors. But to come back to your point, the evidence in the record was the mother's testimony that she makes well over $100,000 a year, that she never had any problem providing for the needs of the son throughout this period of time. What about your other arguments? You do have several others. I do, Your Honor. On 803 and the Confrontation Clause, we suggest that the analysis really begins and ends with this Court's decision in Oriana Blanco. For evidence like those computerized records to come in, they're supposed to be ministerial and administrative, not adversarial. Much like Oriana Blanco, which was a green card interview by an INS employee, the test isn't, was it designed to be evidence of a criminal case? The test is, might it be? And in fact it did, both in Oriana Blanco and here, end up being used in a criminal case to prove intent. In addition, under the Bull Cumming case that we submitted in our 20HA letter recently, there was not even an adversarial document. And the analysis, whether there's a Confrontation Clause violation, is whether or not the document is testimonial. Justice Ginsburg, citing the Melendez-Diaz case, talks about documents that are simply affirmations made for the purpose of establishing or proving a fact in a criminal proceeding. Justice Sotomayor in concurrence, and this is the case from just two weeks ago, talks of a primary purpose of creating an out-of-court substitute for trial testimony. Here, these documents, the computerized records which we provided to the Court, are framed in the first person. They contain a number of adversarial statements, including that I understand I can be imprisoned. Counsel, the difference I see in Oriana Blanco was that the document was signed under oath and it was completed by law enforcement personnel. We don't have that in this case. It was more an administrative, ministerial form. It wasn't completed under oath and it wasn't administered by law enforcement personnel. So I see that as a real distinction in your reliance on the Blanco case. The government in full coming also argued that the document wasn't under oath, as it was, I believe, in Melendez-Diaz, a very similar case to the blood alcohol certificate. Law enforcement personnel, too. And then on the court, I think the Supreme Court put that argument to rest. On law enforcement personnel, I can see there is a line of cases in this circuit. You only have about 9 or 10 seconds left. What about these repeated comments about your client made by the prosecutor, as well as the showing of the slide? Your Honor, they were repeated, most importantly, in addition to saying the defendant hasn't denied two elements, which is the comment on silence and which is the verdict. The government projected a slide in bold in the first person on a 10-foot screen in front of the jury, which said the defendant's explanations, which were. But there was an objection to it, wasn't there? There was an objection. And it was sustained? It was sustained four times. And the slide was taken down immediately? More or less immediately, but it was there for the jury to see. How many times did the prosecutor repeat these comments and objections were made and sustained? I believe the answer is four. All right. Four times. Let's hear from the government, and we'll give you a minute for rebuttal. Counsel, we understand your argument. Thank you. Good morning, Your Honors, and may it please the Court. My name is Anne Voights, and I represent the government in this case. Were you trial counsel? I was not. It's never the same attorney when there's prosecutorial misconduct. One of the trial counsels. Alleged. One of the trial counsel is, in fact, present in the courtroom. Oh, okay. If I might begin by addressing some of the factual questions that the Court raised. Specifically, in this case, defendant, it was undisputed that the defendant had had no contact with his son since 2003. He applied for the benefits in 2005, and at that point he had neither seen his son, called his son, nor provided anything since 2003 in support of him. But he was seeking custody, wasn't he? He was seeking custody. At that point, they had an order in 2003, I believe it's Defense Exhibit No. 1, which held that defendant could have supervised visitation, but that in order to restore the regular schedule, he had to pay for an evaluation. Defendant did not do so. And so at that point, although defendant used some of the monies that he had already received at lump sum to provide for that evaluation? He did not. Could he have? It's unclear whether under the evaluation he could have, but what is clear is with respect to whether he knew that his son's needs were met, he couldn't have because he hadn't had contact with his son since 2003. And in fact, the his son's mother's testimony was that in this case, although she said that she had met his basic needs, she said both that she would have preferred to move to an area with better schools, that appears at SER 51, and that while she had had him originally in private school, she had been unable to continue that, and that appears at SER 54. So is that a basic need, though? Is that something that would be considered into whether or not his needs were being met? Education is one of the needs that we have. But I mean a private school education versus a public school education. Is that something that would be considered in terms of whether his needs are met? I believe it could be, Your Honor. Do you have any cases or regulations to cite to? I don't, Your Honor, aside from the basic regulations that we've cited. Was it argued in the court below? It was argued that this was part of her testimony. And what was further argued was that in this case, none of the money, it's unspeakable, none of the money ever went to DB during the time period. None of the money went to his mother, whether it was for food, for clothes, for schooling, for any of his needs. And defendants argued that it was. There's also no evidence that it was being spent. Is that correct? Well, actually, what the Court said in considering its motion for a new trial, and I'd refer the Court to ER 8, is it said that some portions of the money were never accounted for. And so it said, for example, with that lump sum, if you look at the balance at the beginning, which was overdrawn, and then the very minimal balance at the end of the month after the lump sum was accounted for, there were several hundred dollars that, in and of themselves, were never accounted for. And the Court found that that in itself was sufficient to support the verdict in that case. Counsel, could we talk about the prosecutorial misconduct? Certainly, Your Honor. If I could address that. The question that this Court is being asked to consider is not whether the district court was correct in sustaining the objections. The government hasn't disputed that. But what the appropriate remedy was. Well, the problem I have is, why would the prosecutor keep making the same references if the district court had previously said those comments were inappropriate? Four times. Well, I think if the Court looks at each of the statements, what happened was, this was because a relatively inexperienced prosecutor made these statements, immediately was corrected, and then went back. And each statement is different in terms of what they're trying to say. But the same genre of statements, if you will. It's comments on the silence of the defendant, in essence. I think they were not intended as a sort of natural or logical comment on silence. What they were trying to address were the defense arguments. And as the district court found in denying the motion for a new trial, the district court did not. But it did sustain each of the objections. It did. And it also gave instructions at the end. And I would note that defense did not ask either at the time when it made the objections. The defense did not ask for a curative instruction at that point. Nor for a mistrial. Nor for a mistrial. The only time that the issue was raised was after the verdict had been returned. And thus, again, we think that the issue for the four objections also include the showing of the slide? They did. So they're not five. They're just four, including the slide. Is that right? Correct. There's one fifth that was not objected to before the district court was, I believe, in the first paragraph of the government's closing. With respect to the slide, you had asked about how long it was up. And the district court found in denying the motion for a new trial that it was up for the court's phrase was moments. Within a matter of moments, it was taken down that there was no commentary on its comments. Indeed, I think the fact that it was not available for the jury to see very much is evidenced in part by the fact that defense counsel had to ask for a copy because he wasn't entirely sure what had been. Well, it was shown, so the jury did have an opportunity to see it. It was shown, but it was taken down. And the district court did instruct the jury during the instruction. And it had a bold, inflammatory title. I mean, it only takes moments, lies the defendants told or something the defendant told or stories the defendant told, something pretty inflammatory. And yet the defendant didn't testify. The defendant did not. But all of those comments were made in response to defense theories of the case. And as the district court found, most of these statements would have been permissible had it, instead of saying first person or instead of saying defendant, had it said defense counsel. And so the Court concluded that in light of its instructions that anything as to which it had sustained an objection was to be disregarded, that the government bore the burden of proof, that, furthermore, the defendant had no burden to present any evidence or to testify, and that no inference could be drawn from defendant's decision not to testify. And those were instructions that came both at the beginning of the trial and at the end. That was sufficient. Sotomayor, at some point, though, you know, the prosecutorial misconduct so infects the trial that it is impossible for a defendant to get a fair trial. You don't think it reached that point in this case with the repeated references? I think in light of the fact that each time when the government, when the objection was made, the government immediately went back and tied it to the evidence in the case, and we set out that in our brief, and I'd be happy to go into that further with the Court, that the Court instructed the jury appropriately. And in light of the remedies that the defendant asked for at the time, the Court acted appropriately. But don't you think you've reached a point where you can't unring the bell? I mean, you can have all of the curative instructions that you want, but each time there's something that's ingrained in the minds of the jurors. They're listening to that over and over. They're listening to the judge attempting to cure it, but it doesn't always cure it. I think we presume that the jury follows the instructions that they're given. And in this case, I think the Court can look both at the fact that the government in its rebuttal reminded the jury that the government bore the burden, and to the overall evidence in this case. It was undisputed that the defendant received these benefits, that none of the benefits ever went to DB, that there were no past expenses that would justify the use of the entire reimbursement check, and that there was no evidence that this was actually going to be used for him. In fact, most of the money ended up in the sister's account to which DB had no access. If I might address the Confrontation Clause issue briefly with respect to the public records, I'd simply ask the Court to take a look at the records here. If you – I think if you look at Exhibits 5 through 7, what they are, they ask a lot of basic ministerial questions. Where do you live? What is your Social Security number? What is your address? What is your phone number? And it included statements about why you think you are the most appropriate representative payment. Those were not, as the district court found, those were not prepared in the course of an investigation. They were part of a routine application for benefits, and as such, they fall squarely within the public records exception. And there is no Confrontation Clause. Ginsburg. And how does this differ? The counsel relies on the Oriano case. How does this differ? Harrington. I think Oriano is very different, because in that case, it was part of an investigation. In that case, he was interviewed under oath after being separated from his wife. It was part of an investigation to ferret out fraud. And the document included what appeared to be the agent's subjective impressions, whereas here, everything that was recorded appears to be basic facts, including defendant's statements about why he believed he would be an appropriate candidate as to be representative payee. And there was a signing under oath and completed by the law enforcement personnel in that case. Yes. If the Court has no further questions. Are you going to address the instruction on willfulness? Yes, I certainly will. With respect to the instruction here, both of the instructions that the defense requested were essentially sort of rat's laugh and rat's laugh light. Both were the first the defendant proposed was that it had to be done with the purpose of violating a known legal duty, and the second was that an act had to be undertaken with the knowledge, not that it was wrongful, but that it was unlawful. Well, your position was that no instruction on willfulness should be given, right? Our position was, in light of what then existed as the Ninth Circuit model commentary to the model instruction, which, in fact, recommended that no instruction be given, there were two options in that commentary. And the district court went with the other. Wait a minute. Recommends that no instruction be given in any case categorically? I said unless the word is in the statute, and then it offered two options. And it is in the statute here. Yes. It's in the indictment. It is. And what the district court did was it did give an instruction, first off, that willfully. It was exactly the same as knowing. In fact, it is not entirely the same. There is some repetition. I'm sorry. There was some repetition, but what differed was that he said that it had to be done intentionally for it to be willfully. And as the district court found, it further instructed. Is intentionally the same as knowing or the same as willfully? In this case, it was part of willfully. It was not included in the definition of knowingly. But the district court also said even if wrongfulness is required, even if some consciousness of wrongfulness is required, he said that the instruction that the government is required to prove that defendant knew that the Social Security funds paid to him were used for the use and benefit of a person other than the minor son, D.B. That's the same as willfully. Yes. It was simply a fact-specific instruction as to what they had to find. And he said, like in Awad, this was not a scheme where you couldn't be aware of what was wrongful, that it was a very basic thing. The money should have gone to D.B., or it should have been used for his needs, and it wasn't. And that instruction was sufficient to have the jury find. It was, no, it was harmless error. It wasn't sufficient in Awad. It was erroneous, but the error was harmless because Awad had been told of what his obligations were. Correct. And we would submit. So do you agree in this case that the instruction was erroneous, but any error was harmless? Are you saying the instruction was not erroneous? We would say first that the instruction is not erroneous, but you have this court finding that it is. How do you square that with Awad, where the assembly instruction was held to be erroneous? I think what differs in this case from Awad is this sort of fact-specific instruction where he says that the government does have to show that the defendant knew that the Social Security funds paid to him were for the use and benefit of a person other than his son for whom those benefits were intended, that that was sufficient to show the wrongfulness. But we'd submit whether this court analyzes it as finds the instruction correct or even if it finds that it was not, that it would be harmless error in light of, as in Awad, the wrongfulness of the scheme, the fact that he was on notice. And the notice comes not only from the exhibits that the defendant has disputed, but for example. Do you think whether it was harmless or not depends on how strong the government's case was? I'm sorry, Your Honor? Do you think whether or not the error was harmless, if it was erroneous, depends on how strong the government's case was? No. I think, well, as to the harmfulness, I believe it does. And looking at the strength of the government's case, the government did have here, even leaving aside the exhibits that defendant has challenged, there was also an exhibit, Exhibit 8, to which the admission of which defendant did not object, which was a letter to defendant, which included a pamphlet about the obligations of a representative payee, how you needed to use the funds. And there was testimony about what those pamphlets included and what they advised the defendant of. Those letters went to the same address where the checks went, and the checks obviously were all received and deposited. There was no indication, nothing to suggest the defendant had not been on notice in this case. Is Section 4085A or A5 unconstitutional and vague? No, Your Honor, it is not. In this case, the question of vagueness turns on whether a reasonable person would anticipate. And as defendant has framed the challenge here, it's simply whether it criminalizing the use of a lump-sum retroactive payment as reimbursement for prior expenses is unconstitutional. But the evidence is undisputed that that wasn't what happened here. Thus, essentially what defendant is asking you to do is to entertain an academic challenge that doesn't, in fact, apply to this defendant's case. Because in this case, the evidence was undisputed that he spent at most approximately $5,000 on DB's needs, and that the rent, in contrast, the lump-sum check was for over $40,000. So again, the strength of the evidence on the prosecutorial side is so strong that we can overlook any other errors that therefore become harmless, is that right? Yes, Your Honor. If there are no further questions, I would be happy to submit. It appears not. Thank you, counsel. We'll give you one minute for rebuttal. Your Honors, I respectfully submit the evidence was not strong at trial on intent. There's no evidence that Mr. Berry was admonished during that interview. There's no signed receipt as required. Without getting too much into the weeds, there was – there were procedures that Mr. Phan, the interviewer, could follow where the platform would prefill. It was called an abbreviated application. It's at SER 204. There's no evidence Mr. Berry received the pamphlets explaining his obligations. There was a box to check for Mr. Phan about how to send things, and he didn't check the box. The evidence was clear on that. Mr. Berry did have custody of his son throughout the period. Legal custody is the right to direct the legal and financial affairs of your child. Mr. Berry had that. The rules allowed savings. The government conceded that. Even for a future home together, if you look at SER 214, the rules allow parents like Mr. Berry to commingle funds in a checking account. That's at SER 213. The rules permitted mislabeling. That's not misuse according to the government. That's SER 213. The Social Security Insurance, SSI, has a lump sum rule. What you have to do under congressional statute when you get a retroactive payment, that's not our regime. We have OASDI, disability insurance. No equivalent rule telling someone in Mr. Berry's situation what to do with a retroactive lump sum payment. Congress specifically passed a statute when you get SSI, which is a very similar benefit under the same title. Did not pass the same rule. Did not direct representative payees that they have to use a retrospective payment in a particular way. With respect to the comment on silence, I just want to emphasize it was repeated. The comments were put in the first person. Words were put into Mr. Berry's mouth. My final point is it's a very powerful argument when a defendant testifies, but the government can get up in closing and call him a liar. It demonstrates consciousness of guilt. When the defendant doesn't testify, there is no place in a government closing for an argument like that. Did that occur during the rebuttal argument by the government or during the initial? It did not at all occur in rebuttal. It was entirely in the opening argument before we said anything. All right. Thank you, counsel. Thank you to both counsel. Thank you very much, Your Honor. The case just argued is submitted for a decision by the court.
judges: Tashima, Rawlinson, Cjj Hatter (C. Cal.), Dj